**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **PATRICK DOWNIE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 09 C 0351** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Nan R. Nolan** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Patrick Downie claims that he is disabled due to major depressive disorder, obstructive chronic bronchitis, hypertension, diabetes mellitus, cardiomyopathy with defibrillator placement, asthma, pulmonary disease and shingles. He seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his claims for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 405(g), 1383(c)(3). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and have filed cross-motions for summary judgment. For the reasons explained below, this case is remanded for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

Mr. Downie applied for DIB and SSI on June 20, 2006, alleging that he became disabled on September 6, 2005. (R. 140-44.) The application was denied initially on October 12, 2006, and upon reconsideration on March 2, 2007. (R. 76-89.) Mr. Downie appealed the Commissioner's decision and, on March 30, 2007, requested an administrative hearing. (R. 90.) The hearing was held before Administrative Law Judge Daniel Dadabo (the "ALJ") on December 7, 2007. (R. 8-49.) On January 25, 2008, the ALJ denied Mr. Downie's claims for benefits, finding that despite his multiple severe impairments, there are jobs that he can perform that exist in sufficient numbers in

the national economy. (R. 57-72.) On November 24, 2008, the Appeals Council denied Mr. Downie's request for review. (R. 1-3.) Thus, the ALJ's decision stands as the final decision of the Commissioner. See 20 C.F.R § 416.1481.

**FACTUAL BACKGROUND**

Mr. Downie was born on September 11, 1959, making him 48 years old at the time of the hearing before the ALJ. (R. 15, 140.) He attended school through the tenth grade. (R. 15.) Mr. Downie worked as a garbage man for the Village of Skokie, and as a maintenance man for two different condominium towers for the better part of twenty years before he ceased working in September 2005. (R. 176.)

**A.    Medical Evidence**

**1.    Physical Impairments**

The first medical report of record relating to Mr. Downie's physical health is from March 31, 2006, when he went to St. Francis Hospital complaining of increasing shortness of breath over a period of several days. (R. 255-58.) Mr. Downie was diagnosed with dyspnea and bronchospasm, and received a breathing treatment and intravenous steroids. (R. 262.) He returned to St. Francis Hospital four weeks later on April 27, 2006, once again reporting difficulty breathing. (R. 269.) At that visit, Mr. Downie was diagnosed with acute asthma exacerbation, and was treated with aerosolized Albuterol. (R. 274.) The following week on May 6, 2006, Mr. Downie reported to Evanston Northwestern Healthcare ("ENH") due to another incidence of shortness of breath, and was again diagnosed with asthma exacerbation. (R. 275.) He was treated with Prednisone and directed to continue home breathing treatments. (R. 278.) On May 15, 2006, Mr. Downie returned to the emergency room at ENH complaining of shortness of breath and unrelenting wheezing. (R. 285-86.) When hospital administration of Prednisone and Albuterol failed to abate his breathing difficulties, he was admitted for further management, but discharged the following day. (R. 289, 298.)

Mr. Downie did not stay away from the hospital for long, however, as he returned to ENH on June 12, 2006, for worsening shortness of breath and wheezing. (R. 305-06.) He was admitted for treatment and testing, including an echocardiogram ("ECHO") to determine whether he was suffering from hypertrophic cardiomyopathy. (R. 308, 315.) Testing for cardiac impairments was particularly pertinent in light of the fact that two of Mr. Downie's brothers died of cardiac impairments while in their twenties (23 and 29). (R. 316.) The ECHO revealed abnormal findings of moderate to severely increased LV wall thickness, moderately increased left ventricular outflow tract velocity, significant intracavity obstruction, and an impaired relaxation pattern of LV diastolic filling. (R. 321.) These test results, combined with Mr. Downie's family history, led hospital physicians to lock in a diagnosis of hypertrophic cardiomyopathy. (R. 322.) They determined that he needed an Automatic Implantable Coronary Defibrillator ("AICD"); indeed, on June 15 a cardiologist emphasized "the need for AICD now." (R. 340.) Given the possibility of "sudden cardiac death," Mr. Downie underwent AICD surgery on June 16, 2006, and was discharged in stable condition the following day. (R. 353-55.)

Mr. Downie followed up with his regular treating physician, Steven Mottl, M.D., on June 21, 2006. (R. 421.) Dr. Mottl noted that Mr. Downie was "[f]eeling much better" at that time. (R. 423.) Mr. Downie also followed up with cardiologist Andrew Hamilton, M.D., on July 26, 2006. (R. 416-18.) Dr. Hamilton noted that despite the surgery, Mr. Downie continued to experience shortness of breath and his hypertrophic cardiomyopathy was still causing symptoms, as evidenced by the fact that his heart rate was not well controlled. (R. 418.) When Mr. Downie saw Dr. Mottl again on September 6, 2006, he was still complaining of shortness of breath. (R. 406.) On October 24, 2006, Mr. Downie met with another cardiologist, Mark Lampert, M.D., who noted that Mr. Downie "has a history of hypertrophic obstructive cardiomyopathy and premature sudden death in first degree relatives." (R. 400-01.) Dr. Lampert also noted that after the prophylactic AICD placement, Mr. Downie was being treated with beta blockers and calcium channel blockers, and was "doing

much better in terms of shortness of breath with this therapy." (R. 401.) Dr. Mottl examined Mr. Downie again on December 6, 2006, and noted a new complaint that at night, "it feels like someone is sitting on my chest." (R. 393.)

Mr. Downie next visited the emergency room at ENH on March 5, 2007, complaining chiefly of difficulty breathing. (R. 509.) Doctors diagnosed him with obstructive chronic bronchitis with exacerbation, and admitted him to the hospital for four days to treat his continued wheezing. (R. 509-10.) During that stay, Mr. Downie stated that he had been feeling depressed since his health had gotten worse. (R. 514.) Mr. Downie returned to the ENH emergency room three times in April 2007 due to a diagnosis of Zoster (commonly known as shingles), complicated by Post Herpetic Neuralgia. (R. 113-15.)

Also in April 2007, Dr. Mottl completed a Physical Residual Functional Capacity ("RFC") Questionnaire regarding Mr. Downie. (R. 109-12.) Dr. Mottl noted that he had been treating Mr. Downie for two years, and diagnosed him with the following impairments: chronic obstructive pulmonary disease, implantable cardiac defibrillator, diabetes mellitus, hypertension, and cardiomyopathy. (R. 109.) Dr. Mottl characterized these impairments as chronic conditions manifested by fatigue and shortness of breath, and opined that Mr. Downie's physical symptoms would frequently interfere with the attention and concentration needed to perform even simple work tasks. (R. 109-10.) Dr. Mottl indicated that based on Mr. Downie's cardiac history, he could be capable of performing low stress jobs involving only desk work; he could stand for only fifteen minutes before needing to sit down or walk around; he could never lift fifty or even twenty pounds; but he could lift ten pounds frequently. (R. 110-11.) Dr. Mottl concluded that Mr. Downie's impairments were likely to produce "good days" and "bad days," and that they would cause him to be absent from work about four days per month. (R. 112.)

## 2.      Mental Impairments

The first medical report of record regarding Mr. Downie's mental health is from November 17, 2006, when he had his first appointment with Lorraine Gade, Licensed Clinical Social Worker (LCSW).  (R. 480-81.)  Therapist Gade diagnosed Mr. Downie with a depressive disorder, noting that his mood was depressed nearly every day and that he was crying nearly every day, in part because he constantly thought about his two younger brothers who had died five and ten years prior, respectively.  (R. 480.)  Mr. Downie reported that he felt guilty that he survived his brothers and visited their gravesites weekly.  Therapist Gade noted that Mr. Downie had difficulty sleeping, and indicated that he "wakes up feeling like someone is standing on his chest (over where pacemaker was put in)."  (R. 480.)  Therapist Gade recommended that Mr. Downie see a psychiatrist, because without treatment his symptoms would most likely worsen.  (R. 480-81.)

Mr. Downie returned to see Therapist Gade two weeks later, at which time he presented as being depressed "all the time," with loss of interest in socializing with friends.  (R. 482-83.)  Therapist Gade noted that his affect was still dysphoric at that time, and the pattern continued at their subsequent appointment on December 14, 2006.  (R. 482, 484-85.)  Therapist Gade noted that Mr. Downie was still depressed and dysphoric on that date, but was motivated to help himself overcome his depression.  (R. 484.)  She gave him suggestions for finding employment, opining that employment would probably reduce his depression, and she continued to urge psychiatric consultation.  Mr. Downie declined the latter suggestion, however, stating that he was already taking enough medications and did not want to take any more.  (R. 484-85.)

At their next bimonthly meeting on December 29, 2006, Therapist Gade noted that Mr. Downie was still depressed and dysphoric.  (R. 486-87.)  She encouraged him to look for part time work and borrow money to attend a DUI program so that he could get his driver's license back.  (Id.)  The next appointment, on January 12, 2007, brought more of the same; i.e., Mr. Downie was feeling depressed and sad despite trying to help himself.  (R. 488-89.)  At their February 2, 2007

appointment, Therapist Gade noted that Mr. Downie was depressed and tearful and that he "[c]an't stop thinking about his deceased brothers." (R. 490.) She also found that he seemed more energized, however, and was following her recommendation of applying for part time work to earn money for the DUI program in order to get his driver's license back. (R. 490-91.)

On April 18, 2007, Mr. Downie met with clinical psychologist Tara Gidney, Psy.D, at the same Resurrection Health Care center where he saw Therapist Gade. (R. 518-19.) Dr. Gidney noted that Mr. Downie was "struggling with depression due to impact of life events, inability to drive and health issues complicating quality of life." (R. 518.) She felt that he needed treatment to enhance coping skills for depression. (Id.) Two days later, on April 20, 2007, Therapist Gade observed that Mr. Downie was very depressed and lethargic, and noted that he felt he would be "unable to work at a job due to difficulty concentrating and dysphoric mood." (R. 520-21.) She found that Mr. Downie was feeling more discouraged about his life, was socially isolated, and was frequently visiting the cemetery where his brothers were buried. Therapist Gade also noted that Mr. Downie was "miserable" from the shingles, even crying from pain. She saw no improvement in his mood and noted that he was still dysphoric. (Id.)

Therapist Gade completed a Mental RFC Questionnaire regarding Mr. Downie on April 24, 2007. (R. 105-08.) She stated that Mr. Downie had a depressed mood nearly every day, was crying nearly every day, had difficulty sleeping, was apathetic, had difficulty concentrating, and had shown little improvement over the course of treatment. (R. 105.) Therapist Gade reported that Mr. Downie's signs and symptoms included anhedonia or pervasive loss of interest in almost all activities; decreased energy; feelings of guilt or worthlessness; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; recurrent and intrusive recollections of a traumatic experience causing marked distress; persistent disturbances of mood or affect; and emotional lability. (R. 106.) Therapist Gade opined that Mr. Downie had no useful ability to maintain attention for a two hour segment; maintain regular attendance and be punctual within

customary, usually strict tolerances; or deal with normal work stress. She also found that Mr. Downie was unable to meet competitive standards with regard to working in proximity with others without being unduly distracted, and that his impairments would cause him to miss work more than four days per month. (R. 107-08.) Lastly, Therapist Gade marked that neither alcohol nor substance abuse contributed to any of Mr. Downie's limitations. (Id.)

At his next appointment with Therapist Gade on May 15, 2007, Mr. Downie reported being very depressed. (R. 522.) He told Therapist Gade that he realized he needed to let go of his two deceased brothers, but could not, and that he had not been able to follow through on getting his driver's license back. (Id.) Therapist Gade observed that Mr. Downie was "obviously not feeling well physically" at that time, as he continued to appear miserable from the pain caused by shingles. (Id.) On June 14, 2007, Therapist Gade noted that Mr. Downie was still depressed, reporting that he cried some nights and mostly stayed home doing very little. (R. 524-25.) She continued to urge him to try to get his driver's license back, but Mr. Downie responded that he did not have the requisite $300 for the application fee. (Id.)

Yet again on July 27, 2007, Therapist Gade noted that Mr. Downie was depressed, with decreased energy and social isolation. (R. 526-27.) She found that he still could not resolve the deaths of his two brothers, which contributed to his ongoing depression in combination with his heart surgery and lack of a job. (R. 526.) At this appointment, Mr. Downie for the first time concurred "that he probably need[ed] medication because he [was] unable to let go of brothers and he was agreeable to psychiatric consultation." (Id.) Nearly three months later, on October 18, 2007, Therapist Gade noted that Mr. Downie's major depressive disorder was in partial remission, but that he was still depressed and lethargic, and had decreased motivation to work. Mr. Downie was also still trying to cope with the loss of his brothers, and reported "questioning whether there is a God and why God would take his younger brother[s] from the family." (R. 536.) Therapist

Gade indicated that Mr. Downie would call her for his next appointment, as he was "relatively stable." (R. 537.)

Mr. Downie failed to appear for an appointment with psychiatrist Vasilis Siomopoulos, M.D., on September 28, 2007, but he did keep an appointment on November 15, 2007. (R. 530-35, 538.) Dr. Siomopoulos noted Mr. Downie's complaints of depression, disturbed sleep, crying spells, and obsessive ruminations about his two deceased brothers. (R. 530.) He opined that Mr. Downie's level of attention was good, although his insight was poor; assigned Mr. Downie a Global Assessment of Functioning (GAF) score of 50[1]; and prescribed Lexapro for the depression. (R. 532-33, 535.)

### 3. Consultative Reports

The record also contains several consultative reports regarding Mr. Downie. The first is from internist Peter Biale, M.D., who examined Mr. Downie for the Bureau of Disability Determination Services ("DDS") on September 21, 2006. (R. 465-68.) After reviewing the information provided by DDS and examining Mr. Downie for 30 minutes, Dr. Biale confirmed that he suffers from diabetes mellitus, hypertension, shortness of breath, and high cholesterol. (R. 467-68.) He nonetheless found him to be "a well developed, well nourished, cooperative male in no acute distress." (R. 465.)

Charles Kenney, M.D. conducted a Physical RFC Assessment of Mr. Downie on October 6, 2006. (R. 469-76.) Dr. Kenney determined that Mr. Downie could occasionally lift 20 pounds and frequently lift 10 pounds, and that he could stand/walk and sit for about 6 hours each in a normal 8-hour workday. (R. 470.) He found that Mr. Downie would be "[l]imited to occasional overhead reaching due to pain," but noted that there were no treating or examining source

---

[1]     A GAF score of 50 signifies "severe symptoms…OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." AM. PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32, 34 (4th Ed., Text Revision, 2000) ("DSM IV-TR").

statements regarding Mr. Downie's physical capacities in the file.  (R. 472, 475.)  Ernst Bone, M.D., reviewed Dr. Kenney's RFC on January 5, 2007, and affirmed that the medical information in the file was consistent with the physical RFC done at the initial level.  (R. 503-05.)

Finally, Robert E. Bussell, M.D. conducted a psychiatric consultative examination of Mr. Downie for DDS on January 26, 2007.  (R. 506-08.)  Dr. Bussell noted that Mr. Downie was pleasant, cooperative, subdued, and not anxious throughout the examination.  (R. 506.)  He observed that Mr. Downie did not have any significant social life, however, and that his only routine activity was weekly visitation of the cemetery where his brothers are buried.  (R. 507.)  Mr. Downie mentioned his deceased brothers four or five times throughout the session, including a statement that at times, when he was asleep or near sleep, he thought he heard one of his brothers calling his name, but looked around and saw that his brother was not there.  (R. 507.)  Dr. Bussell concluded:

> [Mr. Downie's] psychological condition is preoccupation with his cardiac condition, which produces a neurasthenia and a psychological effect on his somatic condition . . . his mental approach to [his cardiac condition] is somewhat, if not considerably, debilitating.  It is the examiner's opinion that his psychological condition relative to his cardiac condition, renders him unemployable at this time.

(R. 507-08.)

## B.      Plaintiff's Testimony

Mr. Downie testified before the ALJ that he worked as a maintenance man and for a garbage company prior to his alleged disability onset date.  (R. 15.)  In response to the ALJ's questioning, Mr. Downie discussed his various prescription medications, including Advair for asthma and Metformin for diabetes.  (R. 17.)  He stated that he took Coreg and Verapamil for his heart condition; that the medications made him feel lazy; and that he felt depressed.  (R. 18.)  Mr. Downie further stated that he took Lexapro for depression, Ambien to help him sleep, Crestor for cholesterol, and additional drugs for hypertension.  (R. 19.)

In March 2007, Mr. Downie was admitted to the hospital because his oxygen level was low. (R. 20.) He subsequently came down with shingles, and stated that he was still suffering from a painful outbreak. The ALJ agreed, noting "for the record that Claimant does appear to have an outbreak of shingles . . . visible on the back of his neck running up into his scalp. These appear to be inflamed, darkened pustules that are about an inch by half an inch wide. There's a number of them." (R. 20-21.)

Mr. Downie confirmed that he lost two brothers to cardiac disease in 2002 and 2005, at the ages of 23 and 29. (R. 16-17.) During the hearing, he continued to testify regarding the untimely deaths of his brothers, stating "sometimes I think about it and I don't know why I break down when I talk about it." (R. 22.) When Mr. Downie spoke of his cemetery visits, the ALJ took a break in the proceedings so that Mr. Downie could collect himself, and Mr. Downie excused himself to the bathroom. (R. 23.) When the examination resumed, Mr. Downie testified to continued treatment with Therapist Gade. He said that he wanted to get his driver's license back and was attending classes in that regard, but his lawyer had told him that the process would take a year or two. He was also attending Alcoholics Anonymous meetings. (R. 23-25.) When asked by the ALJ why he could not do a part time job, Mr. Downie replied that he thought he would try but then get too depressed. (R. 23-24.) He stated that he mostly stayed around the house with his mom and dad during the day, and that he tried not to lift anything over five pounds, as directed by the doctor who put in his defibrillator. (R. 25-26.) Mr. Downie also testified that he could only walk a couple blocks before he would "start breathing real hard." (R. 26.)

When asked whether he thought he could do simple, sedentary work such as "putting pencils into a box" all day, Mr. Downie responded that he did not think so because "I'd get, I can't, I just get depressed. I mean I just feel away. I can't stay, you know, focused on one thing at one time. I don't know. I don't think I'd be able to do it." (R. 27.) Mr. Downie testified that he did not have any friends anymore and usually did not associate with others because he had no other

relatives in Chicago. In addition, his parents did not like him to exert himself physically because "[t]hey lost two sons and don't want to lose another one." (R. 27-29.) Mr. Downie testified that he is from Jamaica, and that he returned there for a cousin's wedding about a year and a half prior to the hearing. (R. 28.) When asked if he wanted to add anything else to help the ALJ make his determination, Mr. Downie reported that at night it felt like somebody was stepping on his chest. (R. 31.)

Upon questioning by his attorney regarding whether he had attempted to work in the past year, Mr. Downie responded that he performed a temporary job for three or four days hooking up computer cords. He testified that "[i]t was kind of depressing, you know, I was doing it, but my body was there but my mind wasn't." (R. 34.)

## C.    Vocational Expert Testimony

William M. Newman testified at the hearing as a vocational expert ("VE"). (R. 37-47.) The ALJ asked the VE to consider a person with Mr. Downie's work background, skill set, and limited education, who could perform light work that did not involve substantial novelty, and who had "at least a moderate level of depression" and was unable to engage in extended communication with others. (R. 39-41.) The VE responded that such an individual could not perform any of Mr. Downie's past jobs, but could work as a packager (29, 978 positions in Chicago), light housecleaner (20,435 positions), and cafeteria attendant (20,666 positions). (R. 41.)

If the same individual could only walk and stand for two hours each workday, with frequent to constant lifting of five pounds, he would be limited to unskilled, sedentary work such as sorting pencils and putting them in a box. The VE indicated that there are 43,881 such jobs available in the metropolitan area. (R. 41-42.) The ALJ next asked the VE to take account of diminished concentration, which could be due to crying spells, lack of focus, or poor sleep. (R. 43.) The VE stated that a sorter or bench assembler of the variety described above would need to be on task at least 50 minutes out of each 60 minute period. (Id.) The VE also opined that a worker who

11

continued to make mistakes would face a low tolerance threshold, and that crying spells would be accepted "maybe twice at the most" but not on a regular basis. (R. 44.) The ALJ then asked whether it would make a difference if instead of crying at his workspace, the individual excused himself to the restroom to collect himself once or twice a day. (R. 45.) The VE responded that it would not make a difference because the quantity and quality of the individual's work would be the decisive factor for his retention. (Id.) Lastly, the VE told the ALJ that the acceptable threshold for missing work was no more than one day per month, or twelve days per year. (R. 45-46.)

**D.      The ALJ's Decision**

In concluding that Mr. Downie had not been under a disability within the meaning of the Act from the alleged onset date through the date of his decision, the ALJ followed the familiar five-step sequential process outlined in 20 C.F.R. § 404.1520. (R. 60-72.) At the first step, the ALJ found that Mr. Downie had not engaged in substantial gainful activity since the alleged onset date. (R. 62.) The ALJ next found that Mr. Downie had "the following severe impairments: depressive disorder, not otherwise specified; polysubstance abuse, in remission; asthma; type II diabetes mellitus; hypertensive heart disease and prophylactic June 16, 2006 pacemaker placement." (R. 63.) At the third step, the ALJ found that Mr. Downie did not have an impairment or combination of impairments that met or equaled one of the listed impairments under the Act. (Id.) The ALJ specifically found that Mr. Downie did not meet listings 12.04 or 12.09 (mental impairments), 4.02 (heart failure), or 4.04 (hypertensive heart disease). (Id.)

Thereafter, the ALJ promulgated the following RFC for Mr. Downie:

to perform light work on level surfaces, away from unprotected heights, heavy equipment and operating machinery and subject to no excessive concentrations of dust, fumes, odors or temperature extremes, no more than occasional bending and stooping, and no overhead reaching. As to mental capacity, the claimant retains the capacity to perform work learnable on short demonstration that is routine and does not involve substantial day-to-day novelty, or extended communication with others.

12

(R. 64.) In making this determination, the ALJ noted that "the objective findings in this case fail to provide strong support for allegations of disabling symptoms and limitations." (R. 65.) The ALJ also found that "the claimant's medically determinable impairments reasonably could be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible." (R. 69.) This finding was based on perceived inconsistencies in Mr. Downie's statements during treatment sessions and at the hearing. (R. 69-71.)

At step four, the ALJ determined that Mr. Downie was unable to perform any past relevant work. (R. 71.) At step five, however, the ALJ found that Mr. Downie could perform other jobs that exist in significant numbers in the national economy. (Id.) Therefore, the ALJ issued his finding of "not disabled" from September 6, 2005, through the date of his decision on January 25, 2008. (R. 72.)

## DISCUSSION

### A.     Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Act. See 42 U.S.C. § 405(g). The court's review is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the ALJ applied the correct legal standards in reaching his decision. See Nelms v. Astrue, 553 F.3d 1093, 1097 (7th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." Young v. Barnhart, 362 F.3d 995, 1002 (7th Cir. 2004). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002).

## B.  Five-Step Inquiry

To recover SSI and DIB under Titles II and XVI of the Act, a claimant must establish that he has a "disability" within the meaning of the Act.[2]  42 U.S.C. § 1382(c); <u>Diaz v. Astrue</u>, __ F. Supp. 2d __, 2010 WL 421095, at *7 (N.D. Ill. Feb. 2, 2010).  An individual is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905.  To determine whether a claimant is disabled under the Act, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed?  (2) Is the claimant's impairment severe?  (3) Does the impairment meet or equal one of the specific impairments enumerated in the regulations?  (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work?  <u>See</u> 20 C.F.R. § 416.920; <u>Clifford v. Apfel</u>, 227 F.3d 863, 868 (7th Cir. 2000).  If the claimant makes it past step four, the burden shifts to the ALJ to demonstrate that the claimant can perform a significant number of jobs that exist in the economy.  <u>See Young</u>, 362 F.3d at 1000.

## C.  Analysis

Mr. Downie raises several arguments in support of his request for reversal and/or remand. He first claims that the ALJ's RFC assessment is not supported by substantial evidence because it is based on a misinterpretation of the mental and physical health evidence in the record. Specifically, the ALJ failed to give proper weight to treating source opinions, misinterpreted medical chart notes, and ignored the diagnosis of shingles.  Mr. Downie also contends that the ALJ's flawed RFC assessment resulted in inaccurate hypothetical questions to the VE.  Finally, Mr. Downie objects that the ALJ failed to consider the full combination of his impairments, and erred in making a credibility determination.  These arguments will be addressed in turn.

---

[2]    The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq*.  The SSI regulations are virtually identical to the DIB regulations and are set forth at 20 C.F.R. § 416.901 *et seq*.

## 1.    The ALJ's Mental RFC Determination

Mr. Downie argues that the ALJ's mental RFC determination is not supported by substantial evidence principally because he did not give proper weight to treating source medical opinions.  In Mr. Downie's view, the "constellation of therapeutic and psychiatric sources" in the record, including opinions from Dr. Siomopoulos, Therapist Gade, and Dr. Bussell, establish limitations that inevitably lead to the conclusion that he is disabled.  Plaintiff's Motion for Summary Judgment (hereafter "Plaintiff's Motion"), at 8.

"[A] treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is (1) supported by medical findings; and (2) consistent with substantial evidence in the record."  Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008).  See also 20 C.F.R. § 404.1527(d)(2).  If the medical opinion "is well supported and there is no contradictory evidence, there is no basis on which the ALJ, who is not a physician, could refuse to accept it." Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006).  Mr. Downie asserts that Dr. Siomopoulos and Therapist Gade were both his treating physicians, and that their opinions were entitled to controlling weight.

The Commissioner concedes that Dr. Siomopoulos assigned Mr. Downie a GAF score of 50, "reflecting serious symptoms or a serious impairment in social, occupational, or school functioning."  Commissioner's Cross-Motion for Summary Judgment (hereafter "Commissioner's Cross-Motion"), at 6.  The Commissioner disputes, however, that Dr. Siomopoulos is a treating medical source, noting that he only saw Mr. Downie one time.  Commissioner's Cross-Motion, at 5.  To be sure, "[i]t would be exceedingly illogical to credit a doctor's opinion because he is *more likely* to have a detailed and longitudinal view of the claimant's impairments when *in fact, there is no detail or longitudinal view*."  Scheck v. Barnhart, 357 F.3d 697, 702 (7th Cir. 2004) (emphasis in original) (citing 20 C.F.R. § 404.1527).

In any event, there can be no dispute that Therapist Gade qualifies as a treating source, and that she assigned Mr. Downie a similar GAF score of 51. (R. 66.) Therapist Gade saw Mr. Downie at least a dozen times over the course of nearly a year, creating longitudinal familiarity. (R. 480-91, 518-27, 536-37.) The Commissioner argues that the ALJ properly discounted Therapist Gade's opinions because "as a social worker, Ms. Gade was an 'other source' whose opinion was generally entitled to significantly less weight than that of a physician." Commissioner's Cross-Motion, at 8. The Social Security Regulations, however, recognize that

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as . . . licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

SSR 96-03p.

The Commissioner concedes that the ALJ "did not reference or weigh Ms. Gade's April 2007 opinion," which "was rather restrictive." Commissioner's Cross-Motion, at 9. Indeed, Therapist Gade's April 2007 mental RFC assessment indicated that Mr. Downie's depression had shown little improvement, and that he had no useful ability to maintain attention for a two hour segment, maintain regular attendance and be punctual, or deal with normal work stress.[3] (R. 105-08.) It is true that Therapist Gade repeatedly encouraged Mr. Downie to try and work to help take his mind off his brothers and his heart condition, but this is not necessarily inconsistent with a finding that he remained depressed and unable to hold a steady job.

---

[3]     Mr. Downie asserts, almost as an aside, that the functional limitations described in Therapist Gade's assessment "are indeed adequate or equal to meet or equal the listing 12.04, the applicable listing for Affective Disorders including Depression." Plaintiff's Motion, at 10. The court is under no obligation to assess the merits of this cursory argument. See Burton v. Massanari, 17 Fed. Appx. 396, 401 (7th Cir. 2001) (citing United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim. . . . Judges are not like pigs, hunting for truffles buried in briefs.")

In addition to ignoring Therapist Gade's mental RFC, the ALJ also focused mostly on any positive comments she made, while at the same time diminishing the weight of her more negative conclusions. For example, the ALJ's entire analysis of Mr. Downie's final meeting with Therapist Gade was that "Therapist Gade inferred he was relatively stable and that his depression was in partial remission. She observed that his depression had lessened." (R. 68.) At this appointment, however, Therapist Gade also noted that Mr. Downie had a "depressed mood" and a "sad" affect; that he had "been questioning whether there is a God and why God would take his younger brother[s] from the family"; that he appeared sluggish; and that he had "less motivation to move in a positive direction with his life." (R. 536.) It is well-established that "[a]n ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider 'all relevant evidence' . . . It is not enough for the ALJ to address mere portions of a doctor's report." Myles v. Astrue, 582 F.3d 672, 678 (7th Cir. 2009). The ALJ erred in selectively considering Therapist Gade's reports in this case.

The Commissioner disagrees, arguing that the medical records favorable to Mr. Downie's claim contain inconsistencies that justify discounting them. To the contrary, there is not a single mental health opinion in the record that contradicts the findings of Dr. Siomopoulos, Therapist Gade or Dr. Gidney. It appears that the ALJ did review one opinion suggesting that Mr. Downie did not have a severe impairment, but this unidentified physician's opinion inexplicably was not made part of the record before the court. Commissioner's Cross-Motion, at 8 (conceding that "this physician's opinion is not in the record.") The ALJ also discounted Dr. Bussell's opinion that Mr. Downie's approach to his cardiac condition was "somewhat, if not considerably, debilitating" and that "his psychological condition relative to his cardiac condition, renders him unemployable at this time." (R. 507-08.) The Commissioner is correct that the ultimate determination of disability is reserved to the Commissioner. See, e.g., Johansen v. Barnhart, 314 F.3d 283, 288 (7th Cir. 2002) (finding that physician's opinion that claimant was unable to work was not conclusive on the ultimate issue

of disability, for that is the province of the Commissioner); <u>Dixon v. Massanari</u>, 270 F.3d 1171, 1177 (7th Cir. 2001) (same). Here, however, the ALJ failed to adequately explain why he afforded Dr. Bussell's opinion "only minimal weight." (R. 67.)

In determining that Dr. Bussell's assessment was not entitled to much weight, the ALJ inferred that Mr. Downie's underlying subjective history was not credible. The ALJ noted, for example, that Mr. Downie denied having any pronounced physical limitations, but claimed to be unable to work due to lack of energy. (R. 66.) Where a mental impairment is involved, however, it is entirely possible to be physically functional but still lacking in the energy necessary to maintain employment. Notably, in the year preceding the December 2007 hearing, Mr. Downie attempted to work hooking up computer cords, but he only lasted three or four days because "I was doing it, but my body was there but my mind wasn't." (R. 34.) See Porter v. Barnhart, No. 04 C 6009, 2007 WL 2874704, at *5 (N.D. Ill. Sept. 26, 2007) (ALJ erred in failing to consider "the particular impact that [the claimant's] depression might have had" on her ability to engage in employment).

The ALJ also made much of the fact that Mr. Downie was not genuinely hallucinating when he described hearing his brothers as he fell asleep. (R. 67.) There is no medical evidence suggesting, however, that an individual cannot be depressed about his dead brothers without having hallucinations about them. To the contrary, the ALJ makes no mention of the fact that when Mr. Downie discussed his brothers at the hearing, he broke down and needed a break to collect himself. (R. 22-23.) Finally, the ALJ asserts that "[b]ased upon Dr. Bussell's examination . . . the non-examining state agency medical consultants inferred that the claimant did not have a severe mental impairment." (R. 70.) Presumably, the ALJ is referring to Dr. Kenney and Dr. Bone, but neither doctor could have relied on Dr. Bussell's examination because it occurred <u>after</u> the two consultants filed their reports. (R. 469-76, 503-05.) Moreover, neither Dr. Kenney nor Dr. Bone assessed Mr. Downie's mental (as opposed to physical) ability. These errors preclude a finding that

18

the ALJ's decision was supported by substantial evidence, particularly given the other evidence in the record of disabling depression.

In addition, the ALJ misinterpreted medical chart notes in this case in a manner that further calls his decision into question. The ALJ interpreted the entry "n/a" in the treatment notes of Therapist Gade and Dr. Gidney for the category "Adaptive Functioning Deficit (*required for day treatment and social rehab. notes*)" to mean that Mr. Downie had no difficulty with adapting. (R. 67, 71) (emphasis in original). The ALJ stated that Mr. Downie's "adaptive functioning was 'not applicable,' which the undersigned construes as meaning she did not regard the claimant as having any adaptive limitations." (R. 67.) Regarding a separate appointment note, the ALJ again said that "not applicable" "signif[ied] no difficulty adjusting and coping." (Id.) Later in the opinion, the ALJ once more wrote that "as recently as April and May 2007, psychologist Gidney could not discern any defective adaptive functioning. The undersigned accordingly infers merely moderate Part 'B' limitations as discussed above." (R. 71.)

The problem with these statements is that the evidence reflects that Mr. Downie's "Adaptive Functioning Deficit" was repeatedly marked "n/a" because he was not a candidate for day treatment or social rehabilitation programs. Plaintiff's Motion, at 10-11. The Commissioner does not contest that the ALJ misinterpreted the chart notes, but seeks to minimize their importance to the ALJ's decision. Commissioner's Cross-Motion, at 8-9. The ALJ's misinterpretation, however, certainly played a role in his finding that Mr. Downie suffers from "merely moderate" mental limitations.

Perhaps, as Mr. Downie contends, the ALJ's misinterpretation could have been avoided if he had the assistance of a medical expert to testify regarding the medical records. See Green v. Apfel, 204 F.3d 780, 781 (7th Cir. 2000) ("the procedure for adjudicating social security disability claims . . . requires the administrative law judge to summon a medical expert if that is necessary to provide an informed basis for determining whether the claimant is disabled.") Regardless, the ALJ's mental RFC as a whole is not supported by substantial evidence, and the case must be

remanded for reconsideration of that finding. At a minimum, any opinion relied on by the ALJ but not included in the record before the court should be made part of the record on remand, and the ALJ should provide a balanced interpretation of the medical evidence regarding Mr. Downie's mental abilities as they relate to his claim for disability benefits.

### 2. The ALJ's Physical RFC Determination

Mr. Downie argues that, like the ALJ's mental RFC determination, his physical RFC assessment is not supported by substantial evidence. Mr. Downie notes, for example, that the ALJ failed to consider the RFC supplied by his regular treating physician, Dr. Steven Mottl. Dr. Mottl indicated that Mr. Downie could only stand for fifteen minutes at a time before needing to sit or walk around, was limited to low stress desk jobs, and could never lift 20 pounds. (R. 110-11.) Yet the ALJ concluded that he was capable of performing light work requiring an ability to stand or walk for at least six hours in an eight-hour workday, and to lift up to 20 pounds. Outlaw v. Astrue, No. 08 C 4729, 2010 WL 678118, at *13 (N.D. Ill. Feb. 25, 2010) (stating parameters for "light" work). The Commissioner concedes that the ALJ did not mention Dr. Mottl's RFC, but contends that he "reasonably considered" it nonetheless "because there was almost no treatment evidence to support it." Commissioner's Cross-Motion, at 10. The court disagrees.

Dr. Mottl had treated Mr. Downie for two years at the time he made his RFC assessment. He identified Mr. Downie's multiple chronic conditions and opined that his symptoms would frequently be severe enough to interfere with the attention and concentration needed to perform even simple work tasks, among other limitations. (R. 109-12.) The Commissioner argues that Dr. Mottl's opinion was not supported by his own examination findings and conservative course of care, such that the ALJ was justified in relying instead on the opinions of consulting physicians. The ALJ, however, did not offer this as an explanation for rejecting Dr. Mottl's RFC. Kenefick v. Astrue, 535 F. Supp. 2d 898, 907 (N.D. Ill. 2008) (rejecting the Commissioner's "post-hoc rationale" for an ALJ's opinion). Significantly, unlike Dr. Mottl, the consulting physicians only saw Mr. Downie once. On

this record, the court cannot determine whether the ALJ fairly balanced the competing medical opinions despite failing to reference a treating source's RFC.  See 20 C.F.R. § 416.927(d) ("Regardless of its source, we will evaluate every medical opinion we receive.")  On remand, the ALJ should evaluate and weigh Dr. Mottl's RFC and fully balance his medical judgments with those of the other medical sources in the record.

Mr. Downie also objects to the ALJ's depiction of the results of his post-pacemaker spirometry.  The ALJ at one point describes the spirometry as revealing "only very mild documented ventilatory restriction."  (R. 70.)  More precisely, Mr. Downie's forced expiratory volume ("FEV1") score was 64 percent.  According to the medical chart reproduced in the text of the ALJ's decision, an FEV1 finding of 65 to 79 percent equals a mild obstruction, whereas an FEV1 finding of 40 to 59 percent equals a moderate obstruction.  (R. 69.)  Mr. Downie's score of 64 falls in between the two, but is closer to the mild range.  The court agrees that the ALJ erred in characterizing the spirometry result as "very mild," though it is not clear that this error was harmful.  See Keys v. Barnhart, 347 F.3d 990, 994 (7th Cir. 2003) ("[T]he doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions.")

More troubling is the ALJ's failure to consider Mr. Downie's diagnosis of shingles.  The Commissioner insists that the ALJ was justified in ignoring the diagnosis because Mr. Downie suffered his first outbreak in April 2007, less than 12 months before the ALJ's January 2008 decision.  Commissioner's Cross-Motion, at 12.  An impairment can meet the durational requirement, however, if it is "expected to last for a continuous period of at least 12 months."  20 C.F.R. § 404.1509 (emphasis added).  The ALJ observed during the hearing that Mr. Downie was in an active outbreak of shingles, and acknowledged that they must have been painful.  (R. 20-21.)  The Seventh Circuit has stated that an ALJ cannot fail to explore or mention altogether an entire diagnosis.  See, e.g., Terry v. Astrue, 580 F.3d 471, 477 (7th Cir. 2009) (holding that impairments that the ALJ ignored must be evaluated on remand); Golembiewski v. Barnhart, 322 F.3d 912, 917

(7th Cir. 2003) (requiring remand because the ALJ improperly ignored lines of evidence).  If the ALJ had reason to believe that Mr. Downie's shingles would not be expected to last for 12 months, he should have articulated his reasoning in his decision.  On remand, the ALJ should assess the extent of any impairment from shingles in combination with the effect of Mr. Downie's other impairments.

       **3.**      **Mr. Downie's Remaining Arguments**

Having determined that the ALJ's mental and physical RFC assessments were flawed, the court also finds that the corresponding hypothetical questions posed to the VE were improper and must be reassessed as well.  <u>Indoranto v. Barnhart</u>, 374 F.3d 470, 474 (7th Cir. 2004) ("If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record."); *Michael v. Astrue*, 543 F. Supp. 2d 860, 868 (N.D. Ill. 2008).  On remand, the ALJ should also take care to analyze Mr. Downie's combination of impairments, and to make thorough credibility findings consistent with SSR 96-7p.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [Doc. 16] is granted in part and denied in part.  Defendant's Cross-Motion for Summary Judgment [Doc. 21] is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Administration for further proceedings consistent with this opinion.

ENTER:

Dated: March 24, 2010

*Nan R. Nolan*

NAN R. NOLAN
United States Magistrate Judge